DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CITY OF WEST PALM BEACH,**
Appellant,

v.

**PALM BEACH COUNTY, FLORIDA DEPARTMENT OF TRANSPORTATION** and **SOUTH FLORIDA WATER MANAGEMENT DISTRICT,**
Appellees.

No. 4D17-1412

[August 8, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Administrative Hearing, SFWMD # 2017-034-FOF-ERP.

Jane Kreusler-Walsh and Stephanie L. Serafin of Law Office of Kreusler-Walsh, Vargas & Serafin, P.A., West Palm Beach, and Kimberly L. Rothenburg of City of West Palm Beach, West Palm Beach, for appellant.

Helene C. Hvizd, Senior Assistant County Attorney, West Palm Beach, and Marc Peoples, Assistant General Counsel of Department of Transportation, Tallahassee, for appellees Palm Beach County and Florida Department of Transportation.

Susan Roeder Martin, West Palm Beach, for appellee South Florida Water Management District.

Jason Totoiu, Lisa Interlandi, and S. Ansley Samson of Everglades Law Center, Inc., Winter Haven, for Amici Curiae-Florida Wildlife Federation, Audubon Society of the Everglades, Sierra Club, Conservancy of Southwest Florida, and National Wildlife Federation.

FORST, J.

Appellant City of West Palm Beach ("the City") challenged the South Florida Water Management District's ("the District") 2016 notice of intent to issue an environmental resource permit to the Florida Department of Transportation ("FDOT") and its co-applicant, Palm Beach County ("the

County") for a road extension project and related surface water management system. The basis of the City's challenge was that the project would have adverse impacts on Grassy Waters Preserve ("Grassy Waters"), a nature preserve and water catchment area owned by the City. Accepting the recommendation of a Department of Administrative Hearings Administrative Law Judge ("ALJ"), the District's final order approved the permit.

The City makes two arguments on appeal. The first is that the City was denied due process based on procedural errors which prevented the City from fully addressing the final permit application. The second is that the ALJ erroneously interpreted the governing water quality standards, resulting in materially flawed findings approved by the District. Concluding that the cumulative effect of the errors materially prejudiced the City, we reverse the final order and remand for a new hearing on the City's petition.

## Background

In 1989, the District issued the original permit conceptually authorizing the construction of a storm water management system known as the Ibis System. The Ibis System was designed to receive and treat water to serve a nearby residential golf community. The original permit has been amended several times over the years.

The Ibis System has two components—Ibis Lakes and Ibis Preserve. When Ibis Lakes reaches a certain water level, the water is pumped into Ibis Preserve. Water from Ibis Preserve then flows into Grassy Waters. Grassy Waters is an oligotrophic wetland and is adversely affected by low levels of nutrients, particularly phosphorus. Grassy Waters is home to numerous species of plants and animals, including threatened and endangered wildlife, which depend on a low phosphorus environment. Grassy Waters is also part of the City's drinking water supply system.

In March 2016, the City filed a petition (amended in June 2016) challenging FDOT and the County's permit application, arguing that the project will have a series of adverse impacts on Grassy Waters. Specifically, the City argued that FDOT and the County failed to provide reasonable assurances that the project would not: 1) adversely impact water quality, and fish and wildlife; 2) cause secondary or cumulative impacts; or 3) fail the public interest test. The City's petition was set for a formal administrative hearing.

About a week before the scheduled start of the final hearing on the permit modification, FDOT and the County amended their application to address the City's concerns about adverse impacts to Grassy Waters. The amended application included revised construction plans, a redesigned storm water management system, a nutrient loading analysis, a compensatory mitigation plan addendum, and a new cumulative impact assessment. One of the main features of the amendment was to increase the width of the proposed swale along the roadway by ten feet and raise the outfall, resulting in the swale retaining more storm water.

The amended application included an assertion that these changes would result in a net improvement to the water quality discharged from the project site. The assertion of a net improvement was not part of the original permit application. Because of the amended application, the City moved to continue the hearing, arguing that the City's expert, Dr. Harper, needed additional time to analyze the amended application and that the City needed more time to depose FDOT and County experts on this issue. The continuance motion was denied by the ALJ.

The final hearings took place on August 23-26 and November 29-30, 2016. The night before the first day of the final hearing, counsel for FDOT received an email from the City with a forty-five page attachment of PowerPoint slides prepared by Dr. Harper which contained his updated opinion as to the project's amended discharge plan. Dr. Harper's updated opinion included an analysis of groundwater seepage from the swale.

On the morning of the hearing, FDOT moved to exclude the updated opinion, arguing that Dr. Harper's original opinion was based only on the surface water discharge from the project, and the groundwater seepage theory should have been argued from the outset because the project had always called for a swale. The City argued that the ten-foot increase in the swale was not a minor modification and that additional time was necessary so that Dr. Harper could analyze the amendment and the City could re-depose pertinent witnesses.

The ALJ called Dr. Harper to the stand to present a summary of his post-amended application opinion to determine whether to allow the groundwater seepage theory, deny the groundwater seepage theory, or to grant a continuance to allow for further discovery. Dr. Harper testified that once he received the amended application he "began to wonder" about the increase in water, the amount that would be stored in the swale, and how much would seep into the ground. Dr. Harper acknowledged that he did not consider groundwater seepage prior to the amended application despite the fact the project had always called for a swale. The ALJ found

that because groundwater seepage was not raised in the petition and was not discussed during depositions, the testimony on the total volume of seepage from the swale would be excluded.

During the course of the hearing, both sides presented several witnesses. After the first phase of the hearing in August, the City renewed its request to allow Dr. Harper to testify about the total volume of groundwater seepage. The ALJ treated the request as a motion to amend the City's petition, which was ultimately denied.

In November, towards the end of the final hearing, the City asked to make a formal proffer of Dr. Harper's groundwater seepage analysis. The ALJ denied the proffer as prejudicial but allowed the proffer of the declaration of Dr. Harper's analysis.

The ALJ issued a recommended order supporting the approval of the permit application as amended. The ALJ concluded that the application met all permitting criteria and that the project would not cause or contribute to a water quality violation; instead, it would create a net improvement in water quality. The ALJ concluded that the evidence did not support the conclusion that groundwater seepage would cause additional nutrient loading into Grassy Waters.

In paragraph 157 of the recommended order, the ALJ held the narrative nutrient standard requires "a system-wide imbalance in natural populations of flora and fauna . . . to establish a violation of the narrative nutrient standard" so "the near-destruction of an ecosystem [is] the line that must be crossed before the standard is violated."

The District and the City filed exceptions to paragraph 157 of the recommendation. The City argued that the ALJ's interpretation of the narrative nutrient standard was erroneous, and the District argued that the narrative nutrient standard is a Florida Department of Environmental Protection ("FDEP") rule and that the District must defer to the FDEP's interpretation of the rule. In its final order adopting the ALJ's recommendations, the District held:

> The dispositive issue on the topic of water quality is that the Project will result in a net improvement by treating its stormwater before it discharges to the Ibis system. . . . Therefore, findings of fact and conclusions of law addressing the narrative nutrient standard . . . do not affect the outcome of this proceeding.

4

## Analysis

Section 120.68(7), Florida Statutes (2018), sets forth the standard of review. An agency action may be remanded or set aside only if we determine: the action depends on a finding of fact which is not supported by competent and substantial evidence in the record; the fairness of the proceeding was impaired by a material error in procedure; the agency erroneously interpreted the law and a correct interpretation compels a particular action; or improper discretion. *Id.*

### A. Florida's water policy

The Florida Legislature has taken due care to protect our water because it is among our most basic resources. § 373.016(1), Fla. Stat. (2016). The Legislature has declared it the public policy of Florida "[t]o promote the conservation, replenishment, recapture, enhancement, development, and proper utilization of surface and groundwater," "[t]o minimize degradation of water resources caused by the discharge of stormwater," and "[t]o preserve natural resources, fish, and wildlife." § 373.016(3)(b), (3)(f), (3)(g). The Legislature delegated to FDEP and the regional water management districts the responsibility to implement that policy through rulemaking and district procedures, including certain standards that must be met before an entity can receive an environmental resource permit that will impact Florida waters. *See* §§ 373.016(5), .4131(1), .414, Fla. Stat.

### B. ALJ's denial of a full opportunity to address the final permit application

An application can be amended even after an agency issues its notice of intent to approve or deny a permit so long as due process is preserved. *See Hamilton Cty. Bd. of Cty. Comm'rs v. State Dep't of Envtl. Regulation*, 587 So. 2d 1378, 1387 (Fla. 1st DCA 1991) ("Any additional information necessary to provide reasonable assurance that the proposed [project] would comply with the applicable . . . standards could be properly provided at the hearing."). This same standard applies to a petition to challenge a permit, which can also be last-minute amended if due process is preserved. *See Fla. Bd. of Med. v. Fla. Acad. of Cosmetic Surgery, Inc.*, 808 So. 2d 243, 256 (Fla. 1st DCA 2002), *superseded by statute*, § 120.52(8), Fla. Stat. (2003)(holding that a party is not precluded from amending its petition, even during a hearing on it, if there is no showing of prejudice); *Key Biscayne Council v. State, Dep't of Nat. Res.*, 579 So. 2d 293, 294-95 (Fla. 3d DCA 1991) (similar).

5

In determining whether the ALJ abused its discretion in denying the motion for continuance, we look to whether the denial created an injustice for the movant; whether the cause of the request was unforeseeable by the movant and not the result of dilatory practices; and whether the opposing party would suffer any prejudice as a result. *See Cargile-Schrage v. Schrage*, 908 So. 2d 528, 529 (Fla. 4th DCA 2005).

In this case, due process required the City to have an opportunity to fully address the amended permit application, particularly because the amended application asserted the net improvement theory for the first time—a theory which became the foundation for the permit's approval. This is particularly true in a case like this, where the subject matter is highly technical; the proceeding is administrative opposed to a civil trial before a jury; and the proceeding's outcome pertains to issues regarding the future impact to the environment and public water supply. It was not the litigation strategy of the City, but rather the late-amended permit application, which caused the need for additional time to fully evaluate these highly technical changes and its impact to the water quality of Grassy Waters. *See, e.g., Carnival Cruise Lines, Inc. v. Nunez*, 646 So. 2d 831, 833-34 (Fla. 3d DCA 1994) (reversing for a new trial where the trial court improperly denied the defendant's motion for continuance to address plaintiff's complaint, which was amended after the start of trial).

Moreover, FDOT and the County did not show they would be prejudiced by a short continuance to allow the City to prepare for their newly asserted net improvement theory and amended application. It was about a week before the start of the final hearing that the permit application was amended; only days after the application was amended, the City moved for a continuance. The City also renewed its motion at the end of the first part of the hearing. If granted, there were two months before the second half of the hearing, and the City could have conducted further discovery on the amendment during that time.

Accordingly, it was error to deny the City the opportunity for additional time to prepare and deliver a response to the permit modifications, to address the newly asserted net improvement theory and its effects on Florida's water resources. *See Key Biscayne Council*, 579 So. 2d at 294-95; *see also Carnival Cruise Lines, Inc.*, 646 So. 2d at 833-34.

## C. ALJ's erroneous interpretation of water quality standards

In applying for the permit, the FDOT and the County were required to provide reasonable assurances that all state water quality standards applicable to Grassy Waters would not be violated by the project. *See* §

373.414, Fla. Stat. At issue is the narrative nutrient standard, which requires that nutrient concentrations shall not "be altered so as to cause an imbalance in natural populations of aquatic flora or fauna." Fla. Admin. Code R. 62-302.530(48)(b). Alternatively, "[i]f the applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, the governing board or the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality in the receiving body of water for those parameters which do not meet standards." § 373.414(1)(b)3., Fla. Stat.

Both the City and the District took exception to paragraph 157 of the recommendation, which was modified by the final order, stating the District would defer to the FDEP's interpretation of the standard. However, the final order did not include a substituted finding and conclusion under the narrative nutrient standard. Even without the FDEP's interpretation, the plain language of the narrative nutrient standard does not require the "near-destruction of the ecosystem." *See Sullivan v. Fla. Dep't Envtl. Prot.*, 890 So. 2d 417, 420 (Fla. 1st DCA 2004) (acknowledging that judicial deference to an agency's interpretation of a statute is not required where the reading is contrary to its plain language). We cannot conclude that the District properly found the application met the permitting criteria (reasonable assurances of compliance with state water quality standards), because the ALJ made material factual findings through the lens of an erroneous interpretation of the applicable standard.

## Conclusion

Florida's policy to protect and conserve our water is a matter of great public importance and the cumulative effect of the ALJ's errors materially prejudiced the City. Accordingly, we reverse the final order and remand for a new administrative hearing on the City's petition.

*Reversed and remanded.*

WARNER and MAY, JJ., concur.

\*          \*          \*

***Not final until disposition of timely filed motion for rehearing.***

7